Argued and submitted November 5, 1987, decision of the Court of Appeals affirmed June 7, 1988

In the Matter of the Compensation of
Pamela R. Stovall, Claimant.

## STOVALL,
*Respondent on Review,*

*v.*

## SALLY SALMON SEAFOOD et al,
*Respondents on Review,*

*and*

## HALLMARK FISHERIES et al,
*Petitioners on Review.*

(WCB 84-13447, 85-01254; CA A38730; SC S33962)

757 P2d 410

Paul L. Roess, Coos Bay, argued the cause and filed the petition for petitioners on review.

James L. Edmunson, Eugene, argued the cause for respondent on review Stovall. With him on the response to the petition were Karen M. Werner and Malagon & Moore, Eugene.

Craig Staples, Portland, argued the cause for respondents on review Sally Salmon Seafood and EBI Companies. On the response to the petition were Jerald P. Keene and Roberts, Reinisch & Klor, P.C., Portland.

LENT, J.

Gillette, J., dissented and filed an opinion in which Peterson, C. J., and Carson, J., joined.

## LENT, J.

The first issue is which of two successive employers is responsible for payment of workers' compensation for claimant's occupational disease, carpal tunnel syndrome. Working conditions at both employers could have caused the disease. Claimant first became disabled from the disease while working for the second employer and first sought medical treatment during that second employment. She would not have required surgery except for the second employment. We hold that the second employer is responsible.

The second issue is whether the later employer can avoid payment of compensation under the doctrine of equitable estoppel because claimant falsely stated on her pre-employment application that she had never had any hand, wrist or arm trouble. We hold that the employer cannot defeat claimant's right to compensation by the defense of equitable estoppel.

## I.

Since the decision in *Sahnow v. Fireman's Fund Ins. Co.*, 260 Or 564, 491 P2d 997 (1971), this court does not review the record anew to make findings of fact. We take the facts as found by the Court of Appeals as those findings may be supplemented by undisputed facts.[1] Following are the facts important to resolution of the issues in this case.

Claimant was employed at Sally Salmon Seafood (Sally) for about one year prior to June 5, 1984. She did not work every day or even all day on some days that she did work. On the other hand, she sometimes worked up to 12 hours per day and more than 40 hours in a week. Her work was shaking crab, which required her at times to strike her wrist against a pan or bench to loosen the crab meat from the shell. She also filleted fish and shucked oysters. Her work caused her to experience pain and swelling in her wrist and hand. She did not lose work on that account. She did not seek medical treatment

---

[1] Some of the findings of fact as to dates by the Court of Appeals in this case, *Stovall v. Sally Salmon Seafood,* 84 Or App 612, 735 P2d 18 (1987), are without any support in the evidence and are not in accord with dates that are undisputed by the parties. We shall use dates undisputed by the parties.

but alleviated her discomfort and the swelling by home treatment, utilizing a kind of liniment and ice packs. Her work with Sally ended on June 5, 1984, but not because of any disability.

On July 28, 1984, she became employed at Hallmark Fisheries (Hallmark). Prior to gaining this employment, she filled out a "PRE-EMPLOYMENT APPLICATION" on a form provided by Hallmark. On that form she checked the "No" space in answering the question: "Have you ever had— 1. Hand, wrist, or arm trouble?"

Her primary work at Hallmark was as a black cod scraper. This required her several hundred times per day to scrape the blood from fish backbones. For approximately the first two weeks she did this work without discomfort. From then on she again experienced discomfort and swelling in the wrist and hand.

She continued to work until midday on September 6, 1984, when she left her job because of the pain and other symptoms in her forearm, wrist and hand, and on the next day she first sought medical treatment for her condition. The doctor diagnosed "[p]robable carpal tunnel syndrome," and later tests confirmed this diagnosis. A few weeks later she had surgery for the condition.

We summarize some important facts. Claimant did not leave her employment at Sally because of the trouble that she was having in her forearm, wrist and hand. She had made no claim, even for medical benefits, under the Workers' Compensation Law before she was employed at Hallmark. She was not disabled at the time she applied for work at Hallmark. She performed the duties of her job at Hallmark for over two months before she became disabled.[2]

## II.

Claimant filed claims against both Sally and Hallmark for workers' compensation. Each employer denied her

---

[2] If, despite her want of disability, claimant would be considered a person with a physical impairment, Hallmark might have been in violation of ORS 659.425 had Hallmark refused to hire or employ her. That issue was raised by claimant in this matter, but we express no opinion thereon because we do not regard it as being necessary to the decision of this case.

claim. She requested hearings and successfully asked that the hearings be consolidated.

At the hearing, both employers conceded that her claim was compensable, but each contended that the other employer was responsible for payment of compensation. In addition, Hallmark contended that she was estopped from asserting a claim against Hallmark because of her false statement that she had not had previous hand, wrist or arm trouble.

At the hearing, claimant conceded that her answer on the application form was false. Hallmark's plant supervisor testified that had she answered the question truthfully, he would have made inquiry into her work history, and had he learned that she had been having the trouble she did have while working at Sally, he would not have "considered her physically fit for the kind of work for which you were going to hire her." He was not asked directly whether he would have hired her, either at all or for other work.

The report of an examining physician stated in part:

"In answer to the questions asked, the diagnosis, I am confident, is carpal tunnel syndrome, status post-release, with significant improvement. I do not feel that the condition was idiopathic but arose as a consequence of her work as a crab shaker and was later aggravated further by cod scraping. I feel that her carpal tunnel syndrome first made its clinical appearance while she was working at Sally Salmon Seafood, and was exacerbated by her activities at Hallmark Fisheries, resulting in need for surgical intervention. * * *

"* * * * *

"In July of 1984 she began working at Hallmark Fisheries and problems again started with the right hand, this time much more severe. * * *

"* * * She was working as a cod scraper at the time of recrudescense of symptoms and surgery in 1984."

The referee found that claimant's carpal tunnel syndrome had its inception during her employment at Sally and that there was only a worsening of symptoms from the employment at Hallmark. The referee specifically rejected

Sally's claim that Hallmark was the responsible employer under the last injurious exposure rule.[3]

On review, the Workers' Compensation Board (Board) stated in its order:

"[W]e find that claimant's work exposure for Liberty's insured [Hallmark] either contributed to the cause of, aggravated, or exacerbated her underlying *disease.*" (Emphasis added.)

The Board stated that it was unconvinced that any one employment was more likely the cause of claimant's "disability." The Board held that the last injurious exposure rule was applicable, thus fixing responsibility on Hallmark. The Board concluded that equitable estoppel should not be applied.

### III.

On judicial review, the Court of Appeals affirmed the Board's decision.[4] *Stovall v. Sally Salmon Seafood,* 84 Or App 612, 735 P2d 18 (1987). The court found: (1) Claimant would not have required surgery had she not worked at Hallmark. (2) Working conditions at both employers could have caused the disease. (3) Claimant did not become disabled until she sought medical treatment while working at Hallmark. On those findings the court concluded that Hallmark was the responsible employer under the last injurious exposure rule.

On the issue raised by Hallmark's contention that this claim is barred under the doctrine of estoppel, the Court

---

[3] The referee's "OPINION AND ORDER" stated the following under a heading "EVIDENCE":

"(5) Although she was aware of her problems, she did not accurately indicate their existence to Hallmark when she applied for work (see Ex. 14). Mr. Adams' testimony indicates that the complaint would have been investigated; the existence of a preexisting condition 'sometimes' means the applicant will not be hired. In her case, she would not have been hired."

This is puzzling; we cannot tell whether the last sentence is meant to indicate that Adams' testimony was that claimant would not have been hired. If so, it is not based on Adams' testimony, for he was not asked that question. If the sentence is meant to be a finding of the referee, it is not set forth in the portion of his "OPINION AND ORDER" under the heading "FINDINGS" even though it would have been important to Hallmark's claim of estoppel had there been reason for the referee to reach that claim.

[4] The Court of Appeals reversed a part of the Board's decision pertaining to attorney fees; that issue is not before us.

of Appeals made no finding of fact whether Hallmark would have hired her had she answered truthfully to the question concerning previous hand, wrist or arm trouble. The court concluded that even if equitable estoppel were available under the Workers' Compensation Law, Hallmark had failed to persuade the court that it would "be appropriate to invoke it here." 84 Or App at 615.

## IV.

On the findings made by the Court of Appeals, this is a classic case for application of the last injurious exposure rule. That rule, as it applies to an occupational disease claim, was stated by this court, *Boise Cascade Corp. v. Starbuck,* 296 Or 238, 241, 675 P2d 1044 (1984), as follows:

> "In Oregon, as in most states, the last injurious exposure rule arose in an occupational disease context. We first applied it in a case involving a hearing loss claim. *Inkley v. Forest Fiber Products Co.,* 288 Or 337, 605 P2d 1175 (1980). In an occupational disease context, the rule is this: If a worker establishes that disability was caused by disease resulting from causal conditions at two or more places of employment, the last employment providing potentially causal conditions is deemed to have caused the disease. The result is that, once the requirement of some contributing exposure has been met, the last employer is liable even though the worker has not proved that the last employment was the actual cause of the disability. 288 Or at 342-43. *Accord, Bracke v. Baza'r,* [293 Or 239, 244-249, 646 P2d 1330 (1982)]. *See also* 4 Larson, Workmen's Compensation Law §§ 95.00-95.21 (1983)." (Footnote omitted.)

On these facts and under that rule, Hallmark is the responsible employer for payment of benefits to this claimant on this claim.

## V.

Hallmark relies on the doctrine of equitable estoppel to defeat the claim. It is conceded by Hallmark that one of the facts that Hallmark must establish to avail itself of the doctrine is that it changed its position in reliance on claimant's false representation, *i.e.,* that had Hallmark known the truth, it would not have hired her as a cod scraper. As we have already pointed out, 306 Or at 28 n 2, the referee's opinion and order is not clear in this respect. The Board made no finding on this element of Hallmark's defense. The Court of Appeals' language is similarly unclear:

> "Hallmark asserts that it should be entitled to raise 'estoppel by conduct' as an affirmative defense to responsibility for the

claim, because it relied on claimant's representation concerning her health in hiring her and would not have hired her had she provided the correct history of her hand problem. Although claimant was less than candid, she had not sought medical treatment for her condition or lost any work as a result of it. We are not persuaded that, even if equitable estoppel is applicable in the Workers' Compensation context to free an employer of responsibility for a work-related condition, it would be appropriate to invoke it here."

84 Or App at 615. We cannot tell whether the dependent clause of the first sentence was meant by the court to be a part of Hallmark's assertion or a finding by the court. If it were meant to be a part of Hallmark's assertion, the last sentence can be read to mean that Hallmark did not establish the necessary fact to the satisfaction of the Court of Appeals as trier of fact. *Former* ORS 656.298(6).

If the requisite fact of change of position has not been established to the satisfaction of the ultimate trier of fact, *i.e.,* the Court of Appeals, that would end the matter, and there would be no need for us to determine whether the doctrine of equitable estoppel can be utilized to defeat a claim for compensation against an otherwise responsible employer. We shall assume for the sake of argument that the Court of Appeals found the fact to have been established.

The doctrine of estoppel is not of recent origin.

" '*Estoppe,*' commeth of the French word *estoupe,* from whence the English word stopped: and it is called an estoppel or conclusion, because a man's owne act or acceptance stoppeth or closeth up his mouth to alleage or plead the truth: and *Littleton's* case here proveth this description.

"Touching estoppels, which is an excellent and curious kinde of learning, it is to be observed, that there be three kinde of estoppels, viz. by matter of record, by matter in writing, and by matter *in paiis.*

"[a]  By matter of record, viz. by letters patents, fine, recoverie, pleading, taking of continuance, confession, imparlance, warrant of attorney, admittance.

"[b]  By matter in writing, as by deed indented, by making of an acquittance by deed indented or deed poll, [c] by defeasance by deed indented or deed poll.

"By matter *in paiis,* as by liverie, by entry, by acceptance of rent, by partition, and by acceptance of an estate, as here in

the case that *Littleton* putteth; whereof *Littleton* maketh a speciall observation, that a man shall be estopped by matter in the countrey, without any writing (1).

> "(1)  The reasons why estoppels are allowed, seem to be these: No man ought to allege any thing but the truth for his defence, and what he has alleged once, is to be presumed true, and therefore he ought not to contradict it; for as it is said in the 2 Inst. 272. *allegans contraria non est audiendus.* Secondly, as the law cannot be known till the facts are ascertained, so neither can the truth of them be found out by evidence; and therefore it is reasonable that some evidence should be allowed to be of so high and conclusive a nature, as to admit of no contradictory proof. *Note the 11th edition.* - [Note 306.]"

II Coke Upon Littleton 352a (Butler and Hargraves, First American Ed 1853, section 667).[5] Although we have here a written false representation, it is not a writing of the kind to which Littleton referred; rather, the claim of estoppel here is that variously known as estoppel *in pais,* estoppel by conduct or equitable estoppel.[6] Where we use the word "estoppel" hereinafter, it refers to this kind of estoppel unless otherwise specified.

In its purer sense the doctrine of estoppel operates to prevent a person from taking a position contrary to that earlier taken; it prevents a person from proving the truth where that is opposed to a false position earlier taken that caused another to rely on the false position and thereby to choose a course of action.

> "[Equitable estoppel is] employed to prevent one from proving an important fact to be something other than what by act or omission he has led another party justifiably to believe."

*Wiggins v. Barrett & Associates, Inc.,* 295 Or 679, 689, 669 P2d

---

[5] Presently extant is a fourth form known as promissory estoppel. *See, e.g.,* Restatement (Second) Contracts § 90 (1979).

[6] By "matter in pais" (French for "country") the courts originally meant matter that was so notorious that all persons in the vicinity would be expected to have knowledge of the matter.

> "The examples which Coke gives of estoppel by matter in pais are livery of seisin, entry, acceptance of rent, partition, and acceptance of an estate—all acts more or less notorious, of which 'the *pays*' might be expected to have cognizance."

9 Holdsworth's History of English Law 159 (1926).

1132 (1983).[7] When used in that sense, the doctrine would be of no avail to Hallmark. This is because claimant's case does not rest on proving now the true history of her arm, hand and wrist trouble. In other words, her case does not rest on denying the truth of what she represented on the application form.

It is fair to say, however, that the doctrine is not as narrow as the above authorities would suggest. For instance, this court has said:

> "This doctrine of equitable estoppel or estoppel *in pais* is that a person may be precluded by his act or conduct, or silence when it was his duty to speak, *from asserting a right* which he otherwise would have had." (Emphasis added.)

*Marshall v. Wilson,* 175 Or 506, 518, 154 P2d 547 (1944).[8] "The doctrine of estoppel is only intended to protect those who materially change their position in reliance upon another's acts or representations." *Bash v. Fir Grove Cemeteries, Co.,* 282 Or 677, 687, 581 P2d 75 (1978). It is on the rule as thus stated that Hallmark must rely. In other words, Hallmark here contends that claimant cannot assert her right to compensation by reason of her false statement and Hallmark's reliance thereon, which we have assumed *arguendo.*

In that broad sense Hallmark would ordinarily be

---

[7]     "The gist of equitable estoppel is that a party who has, by his statements or conduct, asserted a claim based on the assumption of the truth of certain facts, whereby he has obtained a benefit from another party, cannot later assert that those facts are not true if thereby the other party will be prejudiced."

McClintock, Equity 80 (2d ed 1948).

In 28 Am Jur 2d, Estoppel and Waiver, section 27, pages 627-28, is found a "comprehensive definition" distilled from a host of cases listed in a footnote to that text:

> "The most comprehensive definition of equitable estoppel or estoppel in pais is that it is the principle by which a party who knows or should know the truth is absolutely precluded, both at law and in equity, from denying, or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely upon such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion was allowed."

[8] The court purported to state this as the rule by quoting from an earlier opinion, namely, *Bramwell v. Rowland,* 123 Or 33, 44, 261 P 57 (1927). The quoted material itself and other language in *Bramwell* not quoted would support only the rule as stated in the authorities in footnote 6 and the accompanying text.

entitled to rely on the doctrine of estoppel to defeat this claim, but we shall now turn our attention to whether a workers' compensation claim may be barred by estoppel.

While acknowledging that the case did not involve an issue whether a claimant may be estopped from successfully presenting a claim, Hallmark contends that our discussion of equitable estoppel in *Frasure v. Agripac,* 290 Or 99, 104-107, 619 P2d 274 (1980), shows that the doctrine is applicable to workers' compensation cases. In that case the Court of Appeals had held that one employer's insurer, by paying benefits, was estopped by its conduct from later denying a claim on the basis that it was not compensable. We held, in this respect, only that the insurer was not estopped. We did not discuss whether the doctrine of estoppel is available to any party in a workers' compensation case. Finally, we noted on this issue that the insurer had not made a representation normally associated with estoppel.

In answer to questions submitted by this court to decide whether to allow review on this issue, claimant acknowledged that Professor Larson has written:

> "(e)  A false statement in an employment application does not of itself make the employment contract invalid. Benefits are barred only if (1) the employee knowingly and wilfully made a false representation as to his physical condition; (2) the employer relied on the representation and the reliance was a substantial factor in the hiring; and (3) there was a causal relation between the false representation and the injury."

1C Larson's Workmen's Compensation Law 8-284, § 47.00 (1986). In elaborating on this "black letter" statement, Larson continues:

> "§ 47.53 False statements in employment application
>
> "On the basis of the distinction stated in § 47.51, it has been held that employment which has been obtained by the making of false statements — even criminally false statements — whether by a minor or an adult, is still employment; that is, the technical illegality will not of itself destroy compensation coverage. What seems to be emerging, in place of a conceptual approach relying on purely contractual tests, is a common-sense rule made up of a melange of contract, causation, and estoppel ingredients. The following factors must be present before a false statement in an employment application will bar benefits: (1) The employee must have knowingly and

wilfully made a false representation as to his physical condition. (2) The employer must have relied upon the false representation and this reliance must have been a substantial factor in the hiring. (3) There must have been a causal connection between the false representation and the injury." (Footnotes omitted.)[9]

*Id.* at 8-394. In support of this text the author cites in footnote 24 a lengthy list of cases, continuing into the 1987 supplement. We have examined those cases. Some of them are apparently the source of the rule stated by Professor Larson. Others are cases in which the rule, as stated by him, was applied to various fact situations. In some cases application of the rule worked to deny compensation and in others worked not to deny compensation.

These cases are discussed in terms of fraud except for those from Tennessee. *Foster v. Esis, Inc.,* 563 SW2d 180, 182 (Tenn 1978), seems to say that the Tennessee court would deny benefits by application of the doctrine of estoppel; however, the court does not discuss why it chose to apply "estoppel" rather than fraud or misrepresentation. The cases from the many other jurisdictions cited in the footnote do not mention estoppel but discuss whether the claimant must be barred from recovery by reason of fraud or misrepresentation.

The Tennessee court in *Foster v. Esis, Inc., supra,* in applying the doctrine of estoppel, purported to rely on *Federal Copper & Aluminum Company v. Dickey,* 493 SW2d 463 (Tenn 1973). In that case the court found a public policy declared by the legislature to support adoption of Professor Larson's test. The court noted that Tennessee statutes provided for waiver of workers' compensation coverage for a prospective employee "who is susceptible to an occupational disease or has a history of heart disease."[10] *Id.* at 464. The court did not use the word

---

[9] We are not entirely sure what the third element means. If it means that the misrepresentation produced the injury, we think that it would be a rare case indeed that would fit. In the case of an occupational disease, as is the case at bar, certainly the false statement on the employment application did not produce claimant's carpal tunnel syndrome.

[10] Compare ORS 656.806, which provides:

"As a prerequisite to employment in any case, a prospective employer may, by written direction, require any applicant for such employment to submit to a physical examination by a doctor to be designated by the Director of the Department of Insurance and Finance, and paid by such prospective employer. In every case in which such right is exercised, and the applicant is subsequently employed, the employer shall file a true copy of the written direction for and the doctor's findings resulting from the physical examination, with the director within 10 days after the beginning of such employment."

"estoppel" at all in its decision except as it appears in the quotation of Larson's test. It held that one is usually prohibited from "profiteering" from his fraud or wilful misrepresentation and that the result should be no different just because the legislature had not anticipated the "problem" presented by such misrepresentation. We are not quite sure how the *Foster v. Esis, Inc.* court translated this into estoppel.

As discussed by both Professor Larson and by the court in *Teixeira v. Kauikeolani Children's Hosp.,* 3 Haw App 432, 652 P2d 635 (1982), there is a split of authority as to whether misrepresentations will bar a claim and, if so, in what circumstances. Some of the courts that permit a claim to be barred have found policy in their respective state statutes that, although not exactly in point, have led the courts to bar claims. Other courts have found no bar because there is no legislative policy one way or the other. Courts which have not referred to legislative policy have split on whether there should be a rule such as that phrased by Professor Larson.

We do not find any decision, not resting on statute, that persuades us one way or the other whether Oregon should follow either line of authority. Especially we find nothing in the cases that would lead us to recognize a defense of estoppel.

## VI.

This brings us to what this court should do, now faced for the first time with a contention that the doctrine of estoppel should be employed to defeat a claim. We believe the better approach to be an attempt to discern public policy as expressed by the legislature.

The legislature has made it clear that an employer cannot obtain a valid release of a worker's right to benefits for injury under the Workers' Compensation Law. ORS 656.236(1) provides:

"No release by a worker or beneficiary of any rights under ORS 656.001 to 656.794 is valid."

By ORS 656.804 this provision is applicable to claims under the Occupational Disease Law.

The fear that employers or private insurers might attempt to use releases to defeat claims was the reason for inclusion of ORS 656.236(1) in the 1965 major revision of the

Workers' Compensation Law. Skelton, *The 1965 Oregon Workmen's Compensation Law,* 45 Or L Rev 40, 47 (1965). It would appear that the policy underlying the legislative injunction against obtaining releases of a worker's rights would extend to forbidding a waiver of those rights if such were sought as a precondition of employment. This policy points in the opposite direction from the Tennessee statute examined in *Federal Copper & Aluminum Company v. Dickey, supra.*[11]

It must be kept in mind that court decisions in cases arising under the Workers' Compensation Law interpret that statutory law. This seems to have been lost on some of the courts whose decisions are cited by Professor Larson, *supra.* Some of those courts obviously arrived at decisions denying benefits because those courts believed that they were free to engraft on the statutory schemes of their respective states the courts' ideas of what the common law or equity might require in the circumstances.

It also must be remembered that the passage of workers' compensation legislation, while giving to the worker the right to compensation regardless of fault, deprived the worker of the right to maintain an action for damages for injuries suffered by reason of the employer's fault. Early on, this court deemed the legislation was for the benefit of the worker. Whether or not it was exclusively so, that concept led this court to pronounce many times over the years that Oregon's statutory workers' compensation scheme was to be construed

---

[11] The legislature has directed its attention to the effect of a claimant's false representation to secure benefits, but not to the securing of employment. See ORS 656.990(1), which provides:

"Any person who knowingly makes any false statement or representation to the board or its employes, the director or employes of the director, the insurer or self-insured employer for the purpose of obtaining any benefit or payment under ORS 656.001 to 656.794, either for self or any other person, or who knowingly misrepresents to the board, the director or the corporation or any of their representatives the amount of a payroll, or who knowingly submits a false payroll report to the board, the director or the corporation, is punishable, upon conviction, by imprisonment for a term of not more than one year or by a fine of not more than $1,000, or by both."

Although the issue was not before us, we stated in *Bauman v. SAIF,* 295 Or 788, 794, 670 P2d 1027 (1983), that the insurer might be able to deny the compensability of a claim after first accepting it if "there is a showing of fraud, misrepresentation or other illegal activity." That statement was made, however, in the context of making a claim, not in connection with securing employment.

liberally in favor of the worker-claimant. *See, e.g., Fossum v. SAIF,* 289 Or 787, 792-93, 619 P2d 233 (1980):

> "[A]ny such ambiguity must be construed in favor of compensation, just as ambiguous provisions of insurance policies are construed in favor of the beneficiaries, particularly in view of the long-established rule in Oregon that the Workers' Compensation Law must be liberally construed in favor of the worker and compensation. [Citing cases.]"

In short, we understand the philosophy of the Workers' Compensation Law to be that if a person is hired and is, in fact, working for an employer in the role of an employee and becomes disabled as a result of being so employed, the cost of the worker's disability is to be borne by the economy through the employing enterprise and not to be borne by the worker. That statutory policy should not be vulnerable to reopening the way in which a worker in fact obtained the employment when the worker is injured or contracts a disabling occupational disease on the job, perhaps months or years after the event of hiring.

## VII.

We conclude that public policy as expressed by the legislature weighs in favor of not defeating a claim for benefits by application of a doctrine not endorsed by the legislature. If false representations by a worker to obtain employment are to defeat a claim for benefits under the doctrine of equitable estoppel, we leave it to the legislature so to provide.

The decision of the Court of Appeals is affirmed.

**GILLETTE, J.,** dissenting.

There are times when enforcing a pre-existing rule of law creates, or at least can appear to create, an injustice, but the rule must nonetheless be enforced. The majority treats this as such a case. The majority is wrong. There is no pre-existing rule here.

The majority holds — and I agree — that Hallmark is the responsible employer under the last injurious exposure rule, *See Boise Cascade Corp. v. Starbuck,* 296 Or 238, 241, 675 P2d 1044 (1984), unless it is relieved of its responsibility by virtue of its estoppel claim. I also agree with the majority that the Court of Appeals has not given a clear statement as to the

facts it has found that bear on the estoppel question. *See Stovall v. Sally Salmon Seafood,* 84 Or App 612, 615, 735 P2d 18 (1987), discussed by the majority at 306 Or 33. That is regrettable, because a clear finding against Hallmark on the facts would obviate any need for a discussion by the majority, or by me, of the estoppel issue. But it must be discussed.

The majority's discussion is at 306 Or 37-39. It purports to be "an attempt to discern public policy as expressed by the legislature [on the question of whether estoppel is available to parties in Hallmark's position]." 306 Or at 37.

There is no statute directly relating to this issue. The majority purports to find some meaning in the Workers' Compensation Law's prohibition of waivers. ORS 656.236(1); 656.804. 306 Or at 37-38. The majority does not explain just what the analogy is or means, however. For myself, I do not find any analogy at all between forbidding waivers of coverage by employes, on the one hand, and forbidding a potential employe from obtaining employment (and, subsequently, compensation) by fraud, on the other hand. The legislature simply has not spoken to this question, either directly or by implication.

The majority appears to recognize the same thing, because it concludes its case by relying on the old saw that the workers' compensation scheme is to be "construed liberally in favor of the worker-claimant." 306 Or at 38-39, citing *Fossum v. SAIF,* 289 Or 787, 792-93, 619 P2d 233 (1980). This approach works, if at all, only until one backs away a short distance and looks at the resulting proposition. Everyone accepts that the ultimate question is one of legislative intent. The majority announces that it was the legislature's intent, in setting up the workers' compensation system, to permit a worker who *knows* she is physically at risk if she takes a certain job and who *knows* her prospective employer doesn't want to hire her if she *is* at risk to *lie,* get the job, get hurt, and charge the employer for her medical expenses, time loss and degree of permanent impairment, if any. And all this in spite of the fact that (it is assumed) the employer has taken every reasonable step to avoid claimant's injury by establishing a *bona fide* condition on hiring and, in all likelihood, has based its workers' compensation insurance plan on the assumption that the condition will be efficacious.

I would hold that one who intentionally conceals a physical condition in response to a valid inquiry by a prospective employer, who would not have been hired for the particular job she was given had she answered truthfully, and who is hired and thereafter is disabled or requires medical services for the concealed condition, is ineligible for workers' compensation benefits. Accord, 1C Larson, *Workman's Compensation Law,* § 47.00, 8-284 (1986). *See Bauman v. SAIF,* 295 Or 788, 670 P2d 1027 (1983). I would, of course, require the employer or insurance carrier to establish all of the foregoing elements before compensation could be denied.

It is one thing to say that the workers' compensation scheme does not concern itself with fault once a worker is in the system — the trade-off of rights and duties encompassed in the scheme is clear. But this is a case of fraudulently *entering* the system. The legislature has not said it intended to protect or excuse such frauds. The majority is working this unjust result entirely on its own. We do not have to do so.[1]

I dissent.

Peterson, C. J., and Carson, J., join in this dissent.

---

[1] What should be done is to remand the case to the Court of Appeals to make clear findings on the crucial factual issue. If Hallmark has made its case for estoppel, it should prevail.