Kevin O'HARA, Respondent,

v.

A.D. JACOBSON COMPANY, INC., Appellant.

No. WD 50769.

Missouri Court of Appeals,
Western District.

Nov. 14, 1995.

Jeff Stigall, Stigall, Humphrey, Lucas, Henry, Stigall & Dollar, L.P., Kansas City, for appellant.

Stephen K. Nordyke, Kyser & Nordyke, Butler, for respondent.

Before LAURA DENVIR STITH, P.J. and LOWENSTEIN and HANNA, JJ.

LAURA DENVIR STITH, Presiding Judge.

Employee–Respondent Kevin O'Hara injured his back on July 16, 1993, while working for Employer–Appellant A.D. Jacobson Company, Inc. Administrative Law Judge Mark Siedlik denied an award of compensation based on the affirmative defense that Mr. O'Hara fraudulently represented that he had no previous back injuries on an employment application which allegedly requested this information.

The Missouri Labor and Industrial Relations Commission reversed, finding that A.D. Jacobson had not satisfied all of the elements of the affirmative defense of fraudulent rep-

resentation. A.D. Jacobson appeals. We affirm on that ground.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Mr. O'Hara's Employment with A.D. Jacobson and Current Injury.

A.D. Jacobson is a mechanical contractor. The record shows that when A.D. Jacobson needs a pipefitter for a job it is doing, it contacts a union hall, and the hall provides it with a list of available union pipefitters. Any individual A.D. Jacobson selects from that list is immediately considered hired by A.D. Jacobson without the need to complete an employment application.

This appeal arises out of a back injury which Kevin O'Hara sustained on July 16, 1993, while working as a pipefitter for A.D. Jacobson. Mr. O'Hara, who has worked as a pipefitter since 1974, had sustained two back injuries prior to the injury in question. The first back injury, which was work-related, occurred in 1983 and required surgery. Mr. O'Hara was assessed a permanent disability rating of 20 percent and received workers' compensation benefits. Following a period of recuperation, Mr. O'Hara returned to his job as a pipefitter. Seven years later, in 1990, Mr. O'Hara sustained another back injury unrelated to work. Mr. O'Hara obtained medical treatment and was off work for a short period of time.

Mr. O'Hara had been hired through the union hall by A.D. Jacobson to work as a pipefitter on numerous occasions. Two of those occasions were from April, 1988, to February, 1990, and June 13, 1990, to July 17, 1990. Because Mr. O'Hara was hired through the union hall on those occasions, he was not required to fill out employment applications.

On June 15, 1992, A.D. Jacobson again hired Mr. O'Hara through the union hall, and again did so without requiring him to complete an employment application. Two days after he was hired, on June 17, 1992, Mr. O'Hara was required to complete an untitled form which requested personal information and an emergency contact. The form also

asked, "Have you ever received workers' compensation benefits?" Even though Mr. O'Hara had received workers' compensation benefits in the past, the response "No" was placed in the blank left for an answer. This period of employment with A.D. Jacobson ended without incident on July 12, 1992.

On June 28, 1993, Mr. O'Hara was again hired out of the union hall to work as a pipefitter for A.D. Jacobson. As before, because he was hired out of the union hall, Mr. O'Hara was not required to complete an employment application as a condition of employment.

As before, two days after Mr. O'Hara started work, Mr. O'Hara was given a form, this time entitled "Employee Emergency Notification Form" and instructed to fill it out. In addition to requesting information regarding who to notify in the case of an emergency, this form contained a question which stated, "Have you had any bodily ailments in the past? (Heart trouble, diabetes, back trouble, epilepsy, etc.)". Mr. O'Hara answered "No" to this question.

On Friday, July 16, 1993, Mr. O'Hara was performing his job as a pipefitter for A.D. Jacobson. He injured his back by twisting it while he was pulling and lifting a mast out of a roustabout (manual hoist). While Mr. O'Hara was able to finish work that day, he was unable to return to work on the following Monday.

Mr. O'Hara was treated at Hickman Mills Clinic. He returned to light duty work for one week. Mr. O'Hara was unable to tolerate this work and returned to off-work status.

Mr. O'Hara was then referred by A.D. Jacobson to Dr. David Tillema. Dr. Tillema provided medical treatment, including epidural steroid injections and physical therapy. Mr. O'Hara also underwent diagnostic testing which included an MRI. It was Dr. Tillema's opinion that the MRI showed a disc fragment. Based upon this, Dr. Tillema recommended that Mr. O'Hara undergo surgery. On the morning that Mr. O'Hara was scheduled to be admitted for surgery, he was notified by the Builder's Association Self Insurers Fund that the surgery had been canceled.

Mr. O'Hara was subsequently referred to Dr. Edward Prostic. It was Dr. Prostic's opinion that the abnormality visible on the MRI performed by Dr. Tillema was not a disk fragment and was not the cause of Mr. O'Hara's problems. Dr. Prostic opined that Mr. O'Hara sustained a sprain and strain to his lower back with aggravation of his sciatic nerve. Dr. Prostic provided medical treatment including physical therapy and medication. Mr. O'Hara was released to return to work on January 21, 1994.

Mr. O'Hara's workers' compensation claim was heard before Administrative Law Judge Mark S. Siedlik in April, 1994. At the hearing, A.D. Jacobson contended that Mr. O'Hara was not entitled to benefits based on the affirmative defense of fraudulent representation, citing to a Labor & Industrial Relations Commission Decision, *Roxie Frederick v. Delta Airlines,* Injury No. 87–53805.

Mr. O'Hara was the only witness who testified in person at the hearing. The deposition testimony of Dr. Tillema and Dr. Prostic, and of Mr. Lawrence Jabara, the Corporate Secretary and Controller for A.D. Jacobson, was admitted into evidence.

When questioned about the "No" response to the question on the 1993 Employee Emergency Notification Form as to whether he had ever had back trouble, Mr. O'Hara testified that, since he was filling out an emergency notification form, he believed the question only referred to conditions that might be of importance to medical personnel in the case of an emergency. Because his prior back injuries had not required emergency treatment, he did not think that they had to be listed. Mr. O'Hara also said that he did not feel that his prior injuries were "back trouble" because they did not require emergency treatment and he was not suffering from any back problems at the time the form was completed.

Mr. O'Hara denied writing "No" in response to the question regarding previous workers' compensation claims on the untitled form dated June 17, 1992. He claimed he left this space blank and that someone else

must have written in this response. The original of this form was not produced by A.D. Jacobson. Only a copy of this form was entered into evidence.

Mr. Jabara handles the paperwork for all employees of A.D. Jacobson. Through his deposition testimony, Mr. Jabara clarified that the 1993 Employee Emergency Notification Form is a post-employment form, and not an application, stating "It's not something that we look at and then say, you know, make a determination whether that person should come to work for us. It's simply information that we want to have on the person." When asked what actions Mr. Jabara would have taken if Mr. O'Hara had listed the two previous injuries on the form but indicated that he was not having any current problems, Mr. Jabara testified:

> If Kevin would have responded and said, "I'm doing great. I'm not having any problems." I'm not sure I would have done anything. I mean, I don't know. You know, you have to sort of take people at their word for those sort of things. We certainly don't terminate people who indicated that they have problems. But we certainly don't want to aggravate those problems. So, it would have very much depended on his response to that as to what we would have done.

Mr. Jabara also testified that A.D. Jacobson has never changed the work duties of an employee based on information contained on the emergency notification form. The only action taken by A.D. Jacobson was to provide back braces to employees. Back braces, however, were not available at the time that Mr. O'Hara completed the form or when he thereafter reinjured his back.

In his Findings of Fact and Conclusions of Law Administrative Law Judge Siedlik concluded that A.D. Jacobson had met its burden of proof on its affirmative defense of fraudulent representation and held that it acted as a bar to Mr. O'Hara's claims.

The Missouri Labor and Industrial Relations Commission reversed the decision of the ALJ and awarded benefits to Mr. O'Hara. The Commission found that A.D. Jacobson failed to satisfy the elements necessary to establish the defense of fraudulent representation. The Commission also noted that the affirmative defense of fraudulent representation has not been recognized by a Missouri court or the Missouri legislature as a bar to workers' compensation benefits. Moreover, the Commission found that the affirmative defense conflicted with the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, ("ADA") and, as such, should no longer apply as a bar to recovery. This appeal followed.

## II. *STANDARD OF REVIEW*

In *Davis v. Research Medical Center*, 903 S.W.2d 557 (Mo.App. en banc 1995), this Court recently stated the standard of review to be applied in cases such as this in which the Commission has reversed the award entered by the ALJ. *Davis* explained that the Court undertakes a two-step review process, as follows:

> In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence.

*Id.* at 571.

*Davis* also explained the standard of review to be applied by the Court when the Commission's decision as to credibility determinations differs from the ALJ's decision. *Davis* first noted that its review is of the Commission's decision, not that of the ALJ, and that the Commission is not bound by the findings of the ALJ, even on issues of credibility. *Id.* at 570–71. However, "[b]ecause the ALJ's findings and credibility de-

terminations are part of the record as a whole," this Court must take:

> into consideration the credibility determinations of the Commission and, if those determinations as to witnesses who gave live testimony before the ALJ are different than those made by the ALJ, it also considers the ALJ's credibility findings as well as the reasons, if any are given, why the Commission differed with those findings.

*Id.* Where, however, the ALJ and the Commission differ as to their credibility determinations concerning a witness who testified only by deposition, the Commission could determine credibility from the record equally as well as the ALJ. *Id.* at 573. Therefore, the Court gives "no consideration to the ALJ's credibility determination" but will "defer only to the Commission's credibility determination." *Id.*

 As to questions of law, *Davis* explained that "[f]indings and awards of the Commission which are clearly the interpretation or application of the law, as distinguished from a determination of facts, are not binding on the court and fall within the court's province of independent review and correction where erroneous." *Id.* at 571.

## III. EVEN WERE MISSOURI TO RECOGNIZE THE AFFIRMATIVE DEFENSE OF FRAUDULENT REPRESENTATION, THE COMMISSION DID NOT ERR IN AWARDING COMPENSATION TO EMPLOYEE BECAUSE EMPLOYER DID NOT SATISFY THE ELEMENTS OF THAT AFFIRMATIVE DEFENSE

A.D. Jacobson appeals the decision of the Commission. It contends that this Court should recognize the affirmative defense of fraudulent representation and that A.D. Jacobson satisfied all of the elements of this defense.

 The affirmative defense of fraudulent representation serves to bar recovery of workers' compensation benefits by employees who make false statements about their physical condition on *pre-employment* applications when the following factors are present:

(1) The employee knowingly and wilfully made a false representation of his physical condition;

(2) The employer relied upon the false representation and this reliance must have been a substantial factor in hiring the employee; and

(3) There is a causal connection between the false representation and the injury.

1B A. Larson, *The Law of Workmen's Compensation* § 47.53 (1986). The employer has the burden of proving that these factors are satisfied. *Id.*

### A. Other States Have Varied In Their Acceptance of the Affirmative Defense.

As A.D. Jacobson contends, a majority of the states that have considered this issue have adopted the affirmative defense of fraudulent representation as a bar to recovery of workers' compensation benefits. *See Oesterreich v. Canton-Inwood Hosp.,* 511 N.W.2d 824, 828 (S.D.1994). Contrary to the contentions of Mr. O'Hara, several states have adopted this affirmative defense even in the absence of specific legislation recognizing this affirmative defense. *See, e.g., Small v. Oneita Indus.,* 442 S.E.2d 213 (S.C.Ct.App. 1994) *aff'd,* 459 S.E.2d 306 (S.C.1995); *Ex parte Southern Energy Homes, Inc.,* 603 So.2d 1036 (Ala.1992); *Sanchez v. Memorial Gen. Hosp.,* 110 N.M. 683, 798 P.2d 1069 (Ct.App.1990), *cert. denied,* 110 N.M. 653, 798 P.2d 1039 (1990); *Jewison v. Frerichs Constr.,* 434 N.W.2d 259 (Minn.1989); *Shelton v. Clevepak Container Corp.,* 752 S.W.2d 508 (Tenn.1988); *Hilt Truck Lines, Inc. v. Jones,* 204 Neb. 115, 281 N.W.2d 399 (1979); *Kalbes v. Armour Industrial Sec. & Claims Center,* 483 So.2d 124 (Fla.App.Ct.App. 1st Dist.1986); *McDaniel v. Colonial Mechanical Corp.,* 3 Va.App. 408, 350 S.E.2d 225 (1986).

The states that have adopted the affirmative defense in the absence of specific legislation have generally done so based on an equitable doctrine. As stated in *Shelton:*

> An employer takes a worker as he finds him. Consequently, in making application for employment, the worker is required to give full and truthful information regard-

ing his physical health on inquiry by a prospective employer. And, if the worker knowingly and wilfully misrepresents his physical condition and the employer relies on the misrepresentation in employing the worker, the worker will be denied compensation benefits on a showing of a causal connection between the false representation and the injury suffered by the worker.

*Shelton,* 752 S.W.2d at 509 (citations omitted).

Other states which have adopted this affirmative defense have done so based on their interpretation of public policy as stated in other workers' compensation provisions. For example, several states cite to existing laws which deny compensation for "serious and willful misconduct" as the basis for a public policy against fraud. *See Shaw's Supermarkets, Inc. v. Delgiacco,* 410 Mass. 840, 575 N.E.2d 1115 (1991). Several states also look to second injury fund statutes for a legislative policy against fraud. As *Jewison* explained:

> In order to take advantage of the [Second Injury] Fund, employers must have knowledge of the employee's preexisting physical impairment prior to his second injury.... Therefore, concealing a preexisting condition may deprive the employer of the benefits available to him under the Fund.

*Jewison,* 434 N.W.2d at 261. *See also Air Mod Corp. v. Newton,* 59 Del. 148, 215 A.2d 434, 440 (1965).

Other states have rejected this affirmative defense. Most have done so because they can find no provision in their workers' compensation laws which authorizes the denial of compensation based on misrepresentation in securing employment. For instance, *Marriott Corp. v. Industrial Comm'n,* 147 Ariz. 116, 708 P.2d 1307 (1985), refused to adopt this affirmative defense absent express statutory authority. In so holding, it explained that:

> Such an approach is consistent with the long held view that the purpose of the workers' compensation system is to dispense with, as much as possible, the litigation between employer and employee and to place upon industry the burden of compensation.

*Id.* at 1312. *See also Robinett v. Enserch Alaska Constr.,* 804 P.2d 725 (Alaska 1990); *Stovall v. Sally Salmon Seafood,* 306 Or. 25, 757 P.2d 410 (1988); *Teixeira v. Kauikeolani Children's Hosp.,* 3 Haw.App. 432, 652 P.2d 635 (1982); *Goldstine v. Jensen Pre–Cast,* 102 Nev. 630, 729 P.2d 1355 (1986).

### B. *Missouri's Reaction to the Doctrine.*

The Commission's decision to reject the defense below was based, not on the above grounds, but on the fact that in 1990, the United States Congress passed the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* ("ADA"). Pre-employment inquiries regarding an applicant's disability are generally impermissible under the ADA. 42 U.S.C. § 12112(d). In addition, the ADA has been interpreted by the agencies charged with its enforcement as precluding pre-employment questions pertaining to prior workers' compensation claims or the existence, nature, or severity of a disability. 29 C.F.R. § 1630.13(a). The ADA does permit an offer of employment to be made contingent upon a medical examination. However, the employer only has the limited right to require the applicant to undergo a medical examination "after an offer of employment has been made," but "prior to the commencement of the employment duties." 42 U.S.C. § 12112(d)(3).

The Commission was concerned that it would be improper to recognize a defense based on fraud in answering questions the asking of which might be found to be impermissible under the ADA in the first instance.

The many policy issues raised by the Commission and by decisions such as *Marriott Corp. v. Industrial Comm'n,* 708 P.2d at 1312, cause us serious concern as to whether Missouri would or should adopt the fraudulent representation defense. This is particularly true because, as Judge Lowenstein notes in his concurring opinion, Missouri has consistently refused to judicially adopt defenses to workers' compensation claims other than those specifically set out in the statutes themselves. Moreover, none of the non-Missouri cases adopting the defense have addressed the apparent conflict between the defense and the ADA.

In light of these policy issues, we are inclined to believe that if Missouri were to judicially recognize this defense, any such recognition must come from the Missouri Supreme Court, and not from an intermediate appellate court such as this. We need not finally resolve this issue, however, because any such determination would be dicta in light of the fact that the employer has failed to establish at least three elements of the fraudulent representation defense. Thus, regardless whether this Court were to recognize the defense, the judgment for the employee must be affirmed.

### C. The Affirmative Defense of Fraudulent Representation Does Not Apply.

#### 1. The Post–Employment Forms Were Not Applications for Employment.

■ In order for the affirmative defense of fraudulent representation of physical condition to apply, there must first be a fraudulent representation on an application for employment. *See, e.g., Jewison,* 434 N.W.2d at 261 ("makes false statements about his physical condition in a pre-employment application"). The requirement that the representation be made prior to employment is implicit in the rationale of those cases adopting the defense. As explained in *Oesterreich v. Canton–Inwood Hosp.,* 511 N.W.2d 824 (S.D. 1994):

> [A] fair interpretation of the public policy . . . of this state would not allow an employee to procure employment through artifice when the employee has not fairly represented his physical condition and then permit that employee to receive workers' compensation benefits for a claimed exacerbation of his preexisting physical malady.

Id. at 827. In fact, each and every case involving this defense that is cited to this Court by either of the parties involved either a pre-employment application or a pre-employment health questionnaire.[1]

■ It is incontestable that the Employee Emergency Notification Form completed by Mr. O'Hara on June 30, 1993, is not a pre-employment form. Mr. Jabara testified that Mr. O'Hara was referred directly out of the union hall into employment with A.D. Jacobson and thus was not required to complete an employment application. Moreover, it is uncontested that the Employee Emergency Notification Form was completed two days after Mr. O'Hara began working for A.D. Jacobson. As such, it is not a pre-employment application and cannot be considered as the basis for denying Mr. O'Hara benefits.[2]

#### 2. The Commission's Finding that Employer did not Prove that Employee Knowingly and Willfully Made a False Representation of Physical Condition is not Against the Overwhelming Weight of the Evidence.

■ Even were the fraudulent representation doctrine applicable to post-employment forms, however, we believe that the evidence supported the Commission's determination that A.D. Jacobson failed to prove that Mr. O'Hara knowingly and willfully made a false representation of his physical condition. In making this determination, the courts narrowly construe the employment application questions. Questions that are overly broad may not justify application of the affirmative defense.

1. A.D. Jacobson contends that the "issue before this Court is not specific only to the hiring stage of employment as is supported by the Supreme Court of South Dakota's recent decision in *Oesterreich.*" However, the employee in *Oesterreich* was accused of providing false information on an application for employment and the court adopted this affirmative defense based on the rationale stated above. While *Oesterreich* contained some broader discussion in dicta, it does not support an extension of the doctrine here.

2. In reversing the ALJ, the Commission did not rely on the untitled form dated June 17, 1992, because A.D. Jacobson did not cite it as a basis of its affirmative defense in its answer to Mr. O'Hara's claim for benefits. In fact, A.D. Jacobson concedes in its appellate brief that this form "is not a basis of the affirmative defense as pled in this case." Even were it a basis for the affirmative defense, however, this Court has no trouble in concluding that it also is not a pre-employment application. This form was also completed two days after Mr. O'Hara began work. In addition, Mr. Jabara testified that Mr. O'Hara was hired from the union hall and thus was not required to complete an application.

For instance, in *Knight v. Industrial Elec. Co.,* 28 Ark.App. 224, 771 S.W.2d 797 (1989), the court held that the question "Do you have any physical condition which may limit your ability to perform the job applied for?" was too broad to be a basis for denying benefits to the employee. The court noted that the question required the employee to form a medical opinion as to his/her current ability. *Id.,* 771 S.W.2d at 798–99. In addition, the court noted that the employee in that case had recovered from his previous back injury and thus could not have been said to make a knowing and willful false statement as to his current ability. *Id.* at 800. *See also Huisenga v. Opus Corp.,* 494 N.W.2d 469 (Minn.1992), *reh'g, en banc, denied,* (Feb. 4, 1993) (whether or not employee had previous record of workers' compensation was irrelevant to the issue of the employee's prospective job performance. Rather, questions had to specifically relate to the job being applied for).

The ALJ in this case found that Mr. O'Hara made a knowing and willful false representation. In so finding, the ALJ rejected Mr. O'Hara's explanation that he did not think he had a "back problem" because he was able to return to work as a pipefitter after suffering the previous injuries and he did not presently have any back problems.

The Commission, by contrast, found Mr. O'Hara's explanation to be credible. As to the Employee Emergency Notification Form, the Commission explained that:

because employee never previously required nor anticipated any emergency medical treatment for his back it, [sic] was not unreasonable for him to deny that he had any back problems which would require emergency notification. The employee's response to the questionnaire cannot be said to have been intended to deceive.[3]

The Commission thus gave a reason for its disagreement with the ALJ's credibility determinations concerning Mr. O'Hara. That conclusion was supported by Mr. O'Hara's testimony that when he completed the 1993

Employee Emergency Notification Form he was not suffering from any back ailment. It is also uncontested that Mr. O'Hara never required any emergency medical treatment for his back, nor did he have any reason to reasonably anticipate requiring emergency treatment for his back. Moreover, the form was titled "Employee Emergency Notification Form" and A.D. Jacobson did not otherwise instruct employees as to the purpose for which they were to complete the form.

Given these facts, Mr. O'Hara's explanation was not so inherently improbable or contradictory as to make the Commission's reliance on it injudicious, unreasonable, or arbitrary. *Davis,* 903 S.W.2d at 573–74. This Court holds that the Commission's explanation as to why it found that Mr. O'Hara did not make a willful false representation is supported by substantial and competent evidence and is not against the overwhelming weight of the evidence.

**3. *The Commission's Finding that Employer did not Prove that Employer Relied Upon the False Statement of the Employee and that this Reliance was a Substantial Factor in Hiring the Employee is not Against the Overwhelming Weight of the Evidence.***

■ We further find that the evidence supported the Commission's determination that A.D. Jacobson failed to prove that it relied upon the false statement of Mr. O'Hara and that this reliance was a substantial factor in the decision to hire him.

The ALJ determined that A.D. Jacobson had satisfied this requirement "with Mr. Jabara's testimony that if aware of the claimant's condition, he would not have let him work for A.D. Jacobson, and would have returned the claimant to the union hall to have another individual reassigned."

The Commission disagreed with this determination, finding instead that there was no evidence that A.D. Jacobson relied upon any statement of Mr. O'Hara. The Commission stated:

---

3. The Commission did not make a finding as to the good faith with which Mr. O'Hara filled out the untitled form that Mr. O'Hara completed in

1992 because A.D. Jacobson had not stated that the form was a basis for the employer's affirmative defense.

Employer's witness Larry Jabara specifically stated that the information contained in the emergency notification form, for instance, was not something that the employer reviews to determine whether a person should come to work for the employer. Jabara further testified that if he had known of O'Hara's 1984 back surgery and flare up in 1990, he is not sure that anything would have been done differently. He certainly would not have terminated O'Hara as a result of knowing that information.

Based on the testimony of Mr. Jabara, the Commission's decision was not against the overwhelming weight of the evidence. Contrary to the findings of the ALJ and to A.D. Jacobson's contentions in its brief, Mr. Jabara testified that the information on the form was "not something that we look at and then say, you know, make a determination whether that person should come to work for us. It's simply information that we want to have on the person." Mr. Jabara also testified that had he known of Mr. O'Hara's previous injuries, but also knew that Mr. O'Hara was not having any current problems, that "I'm not sure I would have done anything. I mean, I don't know." This alone provides a sufficient basis on which to deny the defense.

For these reasons, we affirm the decision of the Commission, holding that, even were Missouri to require the affirmative defense of fraudulent representation, a step Missouri has not taken, the Commission did not err in finding that A.D. Jacobson had not satisfied all the elements of that defense.

All concur.

LOWENSTEIN, Judge, concurring.

The simple answer to the appellant Jacobson's point concerning the defense of fraudulent misrepresentation, is that such a defense does not, and never has had an existence in Missouri.

I concur with the result reached by the majority, but, rather than analyzing the pros and cons of adopting the affirmative defense for fraudulent misrepresentation, would now rule that this defense should not be judicially

engrafted into the fabric of the statutory scheme of our Workers' Compensation Law as set out in chapter 287. I would reject the appellant's invitation to recognize this affirmative defense for the following reasons:

1. Workers' compensation is a creature of statute, and contrary to a showing of a dire problem, any total bar to recovery by workers should be made by the legislature, rather than by the courts. Present law conclusively presumes previous awards continue undiminished, § 287.190.6, RSMo 1994, and previous injuries are regularly taken into account where there are multiple injuries qualifying for payment under the second injury fund, § 287.220.

2. Adoption of this defense is contrary to the spirit of no-fault in compensation laws as pointed out by the Arizona Supreme Court in *Marriott Corporation v. Industrial Commission,* 147 Ariz. 116, 708 P.2d 1307, 1312 (1985), a case cited in the majority opinion:

> ... absent express statutory authority, a misrepresentation as to physical health to a prospective employer should present no bar to recovery of compensation benefits for industrial injury. If employers were allowed to deny benefits based on the bargaining process that led to the claimant's employment, the disfavored idea that the employee must be free from fault in order to receive compensation would be resurrected.

That Court has further elaborated:

> Misconduct should be—and is—irrelevant ... Payment of benefits does not depend on a claimant's good moral character, but is based simply on an injury within the scope of the workers' compensation statutes.

*Arizona Department of Public Safety v. Industrial Commission,* 176 Ariz. 318, 861 P.2d 603, 608 (1993).

3. Adoption of this defense would complicate rather than simplify compensation claims. In line with the Arizona interpretation, our Supreme Court has said:

> The workmen's compensation law ... has for its legitimate purpose the amelioration of losses sustained by ... employees ... in the interest of employees and the public

welfare.... The purpose is to provide a simple and nontechnical method of compensation for injuries sustained ... out of and in the course of employment and to place the burden of such losses on industry. Innumerable decisions indicate that the law is intended to enable an injured employee to recover compensation and to *do away with common law defenses* and disabilities. (Emphasis added and footnote deleted).

*Bethel v. Sunlight Janitor Service,* 551 S.W.2d 616, 618 (Mo. banc 1977).

This defense and the subsequent bar it carries, sounds in contributory negligence, a doctrine abandoned in our tort law in favor of contributory fault.